IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 01-cv-1250-RPM-CBS

ANA PATRICIA MONTES;
NELY DAVILA;
JOSEFA C. DIAZ;
MARGARITA ERAZO;
EVA ESCOBEDO;
ERNESTO GARCIA;
WILLIE MAE HOPKINS;
ELIZABETH JARAMILLO;
ANGELICA NUNEZ; and
MERVIN D. VARGAS,

    Plaintiffs,

v.

VAIL CLINIC, INC., d/b/a VAIL VALLEY MEDICAL CENTER, INC., and
SERVICEMASTER MANAGEMENT SERVICES LIMITED PARTNERSHIP,

    Defendants.

---

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Except for Angelica Nunez, the plaintiffs are current or former employees of defendant Vail Clinic, Inc. ("Clinic") who worked in the Clinic's housekeeping or kitchen departments. Ms. Nunez was an applicant for a housekeeping position at the Clinic. The plaintiffs are Hispanic, of either Mexican or Honduran national origin, or African-American who allege employment discrimination violations under 42 U.S.C. §§1981 and 2000e *et seq.* and state common law. Some

of the plaintiffs' claims were dismissed by this court's order dated May 10, 2002. The Clinic and Servicemaster Management Services Limited Partnership ("Servicemaster") moved for summary judgment of dismissal as to the remaining claims.

At the hearing on June 7, 2005 this court declined to exercise supplemental jurisdiction over the remaining state law claims[1] and ordered dismissal of Servicemaster (which has been purchased by and is now known as Aramark Management Services, Limited Partnership) because it was not the plaintiffs' employer or prospective employer. The claims remaining asserted by some or all of the plaintiffs are discriminatory disparate treatment (first claim), hostile work environment (second claim), retaliation (third claim), punitive damages (fourth claim), and discrimination in the making and enforcement of contracts (fifth claim).

The filed papers and the statements of counsel at the June 7 hearing show some evidentiary support for the following statement of facts. The Clinic is a hospital located in Vail, Colorado. Douglas Grinnell was the housekeeping and food service manager during the relevant time. Onesima Mejia, a Hispanic woman, originally from Mexico, was supervisor of the housekeeping department.

All of the plaintiffs worked in the housekeeping department except for Elizabeth Jaramillo who worked in the housekeeping and kitchen departments and Ms. Nunez who was a prospective employee. Some Anglo employees worked in the kitchen. The housekeeping staff

---

[1] The seventh through ninth and eleventh through thirteenth claims.

was all Hispanic excepting Willie Mae Hopkins, an African-American. The housekeepers assigned to work in the operating room ("OR") were asked by the nurses not to speak Spanish while they were working there but they were not disciplined for speaking or continuing to speak Spanish. There is evidence that it was important to have clear, precise, and timely communications in the OR. Separate lockers were assigned to the nurses and housekeepers. The kitchen and housekeeping staff were told not to leave their children or family members unattended for an extended period of time in the Clinic.

The plaintiffs' claims are based on a premise that the Clinic considered the work of the housekeeping staff to be appropriate for non-Anglo employees with limited English skills and those working there were treated differently from employees in other non-professional positions. The evidence to support that premise is anecdotal, sporadic and indefinite as to times. There is no basis for finding that all of the plaintiffs shared the same experience in their employment. The individual plaintiffs' claims must be analyzed separately.

Ms. Davila is from Honduras and worked as a housekeeping employee from March 1997 until she quit in April 1999. In June 1998, Ms. Mejia said if she wanted pigs, she could bring them from Mexico; in September 1998[2], Ms. Mejia called her and Josefa Diaz witches from Honduras; Ms. Mejia said "me vale madre; here we do what I say"; in September 1998, when Ms. Mejia's car was scratched she stated Mexicans did not do it but that Hondurans did; in

---

[2] This appears to be the same incident experienced by Ms. Diaz but the dates are inconsistent. Ms. Diaz stated this occurred in April 1998.

3

October 1998, when Ms. Davila tried to talk to Mr. Grinnell in the elevator, he said that he did not understand her because of her strong accent; Ms. Mejia said that Mr. Vargas smelled bad and looked like a black slave; once when she got food after the cafeteria was closed, Mr. Grinnell took it and threw it in the garbage; and in April 1999, when Ms. Davila was supposed to leave early, Ms. Mejia asked her to reclean a room which Ms. Davila did not do.

Ms. Diaz is from Honduras and started in the housekeeping department in January 1997 and transferred to the purchasing department in January 1999. She has had no problems since February 1999. The incidents experienced by Ms. Diaz over the approximately two-year period included the following: in April 1998, Ms. Mejia said that her car had been scratched and that it was not done by Mexicans; in June 1998, Ms. Mejia said that if she wanted pigs, she could get them from Mexico; in September 1998, Ms Mejia said Ms. Diaz and others were witches from Honduras; on one occasion a nurse told her not to speak Spanish in the OR; and in April 1999, when she brought her children to work in the morning to do a walk-in appointment over the lunch hour and her children spent the entire day waiting for her while she worked, Mr. Grinnell said her children could not be there.

Ms. Erazo is from Mexico and worked for the Clinic from December 1995 until April 1999. Her employment was terminated when she forgot to renew her work permit. She was rehired as a seasonal employee in February 1999. She says that soon after she started working at the Clinic a nurse said that Ms. Erazo could not be in the OR because Spanish was not to be

4

spoken there; about two years later (1997) a nurse told her she could not speak Spanish in the OR; in the Fall or Winter of 1998, Ms. Mejia told her she could not change in the nurses' locker room; sometime in the Summer to Winter 1998, Mr. Grinnell was at the cash register and an American nurse took food from the cafeteria and did not have to pay; Ms. Mejia told Ms. Erazo that her unattended children could not be in the cafeteria; and in January 1999, Mr. Grinnell asked Ms. Mejia to tell the housekeepers to bathe.

Ms. Escobedo is from Mexico and worked for housekeeping at the Clinic from December 1997 until she quit in November 1999. Shortly after she started working, the nurses in the OR told her to perform additional tasks and Ms. Mejia said she had to do whatever they asked; in June or July 1998, when she was trying to repay a loan to another employee, Mr. Grinnell "grabbed" her and told her to go to work; Mr. Grinnell teased Ms. Escobedo with her check and then threw it at her; Ms. Mejia criticized Ms. Escobedo and gave her too much work; in May or June 1999, a nurse in the OR told her to speak English there; and Ms. Escobedo quit when a nurse wanted her to bring supplies to stock the OR.

Mr. Garcia is from Mexico and originally started work at the Clinic in January 1995. He quit in May 1999. Mr. Garcia's complaints are that during his employment Ms. Mejia asked the housekeepers not to speak Spanish; in November 1998 Mr. Grinnell told Mr. Garcia that his wife and infant could not wait for him in the hospital lobby; and in May 1999, when he returned to work from vacation and saw additional work on the schedule he quit.

Ms. Hopkins is an African-American woman who worked in the housekeeping department from January 1998 until her discharge in November 1998. Ms. Hopkins' complaints included the following: when Ms. Hopkins was introduced to Mr. Grinnell he called her "Ms. Willie Mae" and continued to do so during her employment; when Ms. Hopkins complained about another employee, Ms. Mejia gave this plaintiff more work; Mr. Grinnell gave her extra work; other housekeeping personnel complained about her which complaints she disputes; and in November 1998 when Mr. Grinnell terminated her, he "grabbed" her and tried to escort her out of the building.

Ms. Jaramillo was born in the United States. English is her first language. Ms. Jaramillo started working at the Clinic in September 1998 as a housekeeper and a dietary aid in the kitchen. She transferred to the medical records department to become a medical records clerk in April 1999. That was a promotion. Ms. Jaramillo's claims are based on incidents occurring before that promotion. She says that kitchen and housekeeping staff worked weekends from time to time except for David LaGrange, an Anglo male, whom Mr. Grinnell favored; Mr. Grinnell said that Mexicans were dirty and lazy; during the last part of 1998, Mr. Grinnell yelled at her when her son was having lunch in the cafeteria; in December 1998, one of the OR nurses asked her not to speak Spanish with Ms. Escobedo because Ms. Escobedo needed to learn to speak English; in December 1998 or January 1999, Mr. Grinnell made a comment about Mexican food being Mexican dirt; and in January 1999, when Ms. Jaramillo burned her feet a social services

6

employee said to Mr. Grinnell's assistant that they should use tap - not sterile - water on her feet.

Ms. Montes is from Mexico and worked at the Clinic from 1992 until her discharge in August 1999. Ms. Montes worked the night shift and saw very little of Mr. Grinnell or Ms. Mejia. Her complaints which occurred over a period of about seven years included the following: Ms. Mejia called Ms. Montes' home and spoke English to her mother and sister when she knew everybody spoke Spanish; in 1992, an OR nurse told her that a pool of blood and bones was Ms. Montes' dinner; sometime before 1995, a nurse asked her not to speak Spanish in the OR; when Patrick Coatney, an Anglo employee, was hired, Mr. Grinnell introduced him but did not do so when new Hispanic employees were hired; in March 1999, when Ms. Montes complimented Mr. Grinnell on his yellow sweater, he said the colors were better than the loud and dirty colors of Mexico; Mr. Grinnell asked whether she had paid for her food at the cafeteria; and Mr. Grinnell called security to make sure she left the Clinic when she was discharged. Ms. Montes admitted that Mr. Grinnell told her she was terminated for insubordination because she refused to throw out the trash when asked by one of her supervisors as she felt it was work that should be done by the day shift person.

In December 2000, Ms. Nunez, from Honduras, applied for a housekeeping position at the suggestion of Ms. Diaz but did not receive an offer for that position.

Mr. Vargas is from Honduras and worked in the housekeeping department from January

1997 until his discharge in May 1999. His complaints over the more than two-year period included the following: Ms. Mejia said to him and Ms. Davila that her car was scratched by Hondurans; in 1998 or 1999, Ms. Mejia took away the keys to the cleaning supply room she had previously given him and gave them to another Hispanic housekeeping employee; Mr. Grinnell believed Mercedes Agurcia (from Honduras) when she accused Mr. Vargas of trying to hit her with a cart; in April 1999, Mr. Grinnell yelled at him when his wife (Ms. Diaz) brought his children to the Clinic for the day; and in May 1999, when he was terminated, Mr. Grinnell told him that he could not come into the hospital again and would have to wait in the hospital parking lot for his wife who was still employed at the Clinic.

Charges of discrimination were filed by Ms. Hopkins on March 3, 1999[3] and by Ms. Nunez sometime after December 2000.[4] The remaining plaintiffs' charges are deemed filed August 17, 1999 through their lawyer's written transmittal, and enclosed intake forms, to the Colorado Civil Rights Division ("CCRD"). The CCRD forwarded the matter to the Equal Employment Opportunity Commission who accepted them for processing.

The plaintiffs allege that all of them were subjected to a hostile work environment. Title VII requires a plaintiff to file a charge within 300 days of the alleged discriminatory practice. 42

---

[3]In footnote 10 of the defendants' brief they state that Ms. Hopkins filed her charge on March 3, 1999, referring to Exhibit G-16, but that exhibit is dated November 3, 1999. Another exhibit, G-8, is dated August 31, 1999. The plaintiffs did not dispute the March 3, 1999 date.

[4]Ms. Nunez's charge is not dated but the alleged act of discrimination occurred in December 2000.

U.S.C. § 2000e-5(e)(1); *Duncan v. Manager, Dept. of Safety,* 397 F.3d 1300, 1308 (10th Cir. 2005). "[W]hen analyzing a hostile work environment claim spanning longer than 300 days a court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Duncan v. Manager, Dept. of Safety, supra* at 1308 (internal quotation marks and citation omitted).

To survive summary judgment on a timely claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder, Colo.,* 388 F.3d 1312, 1327 (10th Cir. 2004) (internal quotation marks omitted). An employee may only rely on evidence of harassment of others of which he or she was aware during that time the employee was allegedly subject to a hostile work environment. *Hirase-Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir. 1995).

Ms. Nunez never worked for the Clinic and admitted she has no facts to support a claim. To the extent that the incidents described by the other plaintiffs may be considered to have occurred within 300 days prior to the filing of their respective charges, they are not sufficiently connected to constitute a continuing violation.

The only incident alleged by Ms. Davila within the 300-day limitations period (October

21, 1998-August 17, 1999) which is related to race or national origin is Mr. Grinnell's alleged statement that he could not understand her because of her strong accent. This incident, even assuming it could be deemed discriminatory, is not sufficiently related to prior incidents to constitute a continuing violation and does not rise to the level required for a hostile work environment claim.

Ms. Diaz transferred to purchasing in January 1999. None of the incidents with any connection to Ms. Diaz's national origin occurred within her 300-day window (October 21, 1998-August 17, 1999), and the incidents complained of are neither severe nor pervasive.

The incidents complained of which has any connection to her race or national origin occurred outside Ms. Erazo's 300-day window (October 21, 1998-August 17, 1999) and there is no linkage between any incidents which occurred inside and outside this window. The incidents are also not sufficiently severe or pervasive.

Ms. Escobedo has alleged one incident within her 300-day window (October 21, 1998-August 17, 1999), the nurses in the OR wanted the housekeepers to speak English there. The head nurse told Ms. Escobedo to practice speaking English so that she could do her job better. The incident is not sufficiently severe or pervasive to constitute a hostile work environment or sufficiently related to link back to incidents outside the limitations period.

Mr. Garcia has asserted one incident with any connection to his national origin, when Ms. Mejia allegedly asked the housekeepers not to speak Spanish, but has not established this

occurred within 300 days of the filing of his charge (October 21, 1998-August 17, 1999). The three incidents he complained of occurred over a four-year period and are insufficient to constitute a hostile work environment.

Assuming Ms. Hopkins' charge was filed March 3, 1999, her 300-day window was between May 7, 1998 and March 3, 1999. Ms. Hopkins testified Mr. Grinnell called her "Ms. Willie Mae" when he started working at the Clinic and continued to call her that during her employment, which was terminated November 1998. Mr. Grinnell also tried to escort her out of the building when she was terminated. These incidents are insufficient to constitute a hostile work environment or to link back to the other incidents complained of.

During Ms. Jaramillo's 300-day window (October 21, 1998-August 17, 1999), a nurse in the OR told her to speak English while working there, Mr. Grinnell allegedly said "What is this Mexican dirt?," a social service employee said that sterile water should not be used on Ms. Jaramillo's injured feet, and Mr. Grinnell yelled at her when her son was eating in the cafeteria. These events are not sufficiently severe or pervasive to constitute a hostile work environment.

Ms. Montes only asserts one incident within her 300-day limitations period (October 21, 1998-August 17, 1999) which relate to her national origin, when Ms. Montes complimented Mr. Grinnell on his yellow sweater, he allegedly said that the colors were better than the loud and dirty colors of Mexico. This incident is not sufficiently severe or related to other incidents identified. The incidents complained of are not sufficiently severe or pervasive.

11

Mr. Vargas has not identified any incidents connected to his national origin which occurred within the applicable 300-day limitation (October 21, 1998-August 17, 1999) so cannot link back to any other incidents. The incidents are also insufficient to establish a hostile environment claim as they were not based on his national origin or sufficiently severe or pervasive.

To establish a prima facie case of disparate treatment, a plaintiff must show: (1) membership in a protected class; (2) an adverse employment action; (3) qualification for the position; and (4) the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination, such as being replaced by a person outside the protected class or being treated differently than similarly situated employees not in a protected class. *Sanchez v. Denver Public Schools,* 164 F.3d 527, 531 (10th Cir. 1998); *Hysten v. Burlington Northern & Santa Fe Ry. Co.,* 296 F.3d 1177, 1181 (10th Cir. 2002). The elements of the prima facie case are flexible and depend on the circumstances of the case. *See Hysten v. Burlington Northern & Santa Fe Ry. Co., supra* at 1181. Although "[t]he Tenth Circuit liberally defines the phrase 'adverse employment action,' . . . 'a mere inconvenience or an alteration of job responsibilities'," *Sanchez v. Denver Public Schools*, *supra* at 532, is insufficient. "Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the action. If the defendant does so, the plaintiff must show the defendant's proffered reasons are pretextual." *Id*. at 531.

Ms. Nunez's disparate treatment claim fails as she testified that she was not hired because she was Ms. Diaz's friend, not because of her national origin. The claims based on national origin are flawed because the employees from Honduras alleged they were treated more poorly than those from Mexico, but the employees from Mexico also claim they were treated poorly. One of the alleged major perpetrators was Ms. Mejia, who is Hispanic and from Mexico, but Ms. Jaramillo, who is Hispanic, testified that she was not treated unkindly and did not hear discriminatory or derogatory comments by Ms. Mejia. There is testimony that Mr. Grinnell was rude to everyone. There is testimony that Ms. Mejia and Mr. Grinnell treated some housekeeping employees better than others, even though all were from protected classes.

Except for Ms. Jaramillo, there are no similarly situated employees not in the protected class. Ms. Jaramillo worked in the housekeeping and kitchen departments and there were Anglo employees working in the kitchen. Ms. Jaramillo testified that David LaGrange did not have to work weekends while the rest of the housekeeping and kitchen staff - including the Anglos - did. The plaintiffs failed to show that their positions were replaced by someone outside of the protected class or that their vacated positions remained open. The plaintiffs have failed to provide evidence sufficient to raise an inference of discrimination to establish a prima facie case of disparate treatment.

Six of the plaintiffs failed to establish an adverse employment action. Ms. Jaramillo and Ms. Diaz transferred from their departments to the medical records department and purchasing

department, respectively, and there is no evidence they suffered an adverse employment action. Ms. Davila, Ms. Escobedo and Ms. Garcia claim they suffered adverse employment actions as they were constructively discharged but their evidence is insufficient to create a genuine issue of material fact that "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sandoval v. City of Boulder, Colo., supra* at 1325 ("[A] plaintiff must show that she had *no other choice* but to quit. The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant."; emphasis in original, *quoting Sanchez v. Denver Public Schools, supra*). Ms. Erazo was a seasonal employee and discharged at the end of the ski season.

Ms. Hopkins was not qualified for her position as, although she disagrees with the veracity of the complaints made against her by others, it is undisputed that complaints were made and documented. The Clinic articulated a legitimate nondiscriminatory reason for her termination and there is an insufficient showing that such reason was pretextual. Mr. Vargas was discharged after he did not clean the elevators as he was asked and Ms. Montes was discharged after she refused to throw out trash asked by one of the supervisors, and neither has shown that his or her discharge was a pretext for discrimination.

The retaliation claims of Ms. Davila, Ms. Erazo, Ms. Escobedo, Mr. Garcia, and Mr. Vargas were dismissed by order dated May 10, 2002, and Ms. Diaz, Ms. Jaramillo, and Ms.

Nunez admit they have no facts to support this claim, leaving as plaintiffs Ms. Montes and Ms. Hopkins. To establish a prima facie case of retaliation, a plaintiff must demonstrate that: 1) she engaged in protected opposition to discrimination; 2) her employer took an adverse employment action against her; and 3) there exists a causal connection between the protected activity and the adverse action. Once a prima facie case is established, the burden shifts "to the employer to produce a legitimate, nondiscriminatory justification for taking the disputed employment action." *Stover v. Martinez,* 382 F.3d 1064, 1070-1071 (10th Cir. 2004). If the employer meets its burden, the burden shifts back to the employee to show that the employer's proffered reason is a pretext for discrimination. *Id.* at 1071.

Ms. Hopkins failed to demonstrate that she engaged in protected activity or that the Clinic's legitimate, nondiscriminatory reason for her discharge, poor performance, was a pretext for discrimination. Ms. Montes failed to demonstrate any causal connection between her protected activity (visiting an attorney) and discharge, or that her discharge for insubordination was a pretext for discrimination.

The plaintiffs with claims under 42 U.S.C. § 1981 are Ms. Montes, Ms. Diaz, Ms. Escobedo, Ms. Jaramillo and Ms. Nunez as the other plaintiffs' claims were dismissed by order dated May 10, 2002. All of these remaining plaintiffs have admitted they have no facts to support this claim except Ms. Montes whose claim fails for the same reason that her Title VII disparate treatment claim fails.

There is no basis for punitive damages. It is

ORDERED that defendant Servicemaster Management Services Limited Partnership is dismissed with prejudice, the plaintiffs' state law claims (seventh, eighth, ninth, eleventh, twelfth, and thirteenth claims) are dismissed without prejudice, the defendants' motion for summary judgment as to the remaining claims (the first, second, third, fourth and fifth claims) is granted and those claims are dismissed with prejudice. The clerk will enter a judgment dismissing the plaintiffs' claims against both defendants with an award of costs to the defendants.

DATED: June 29th, 2005

BY THE COURT:

s/Richard P. Matsch

Richard P. Matsch, Senior District Judge